**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Sacramento, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.ortega@towerlegalgroup.com
Attorneys for Plaintiffs and the Class [Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD HOLLIEN, JOSH McCORMICK, CHARLES WHITTELSEY, individually, and as representatives of a Putative Class of Participants and Beneficiaries of and on behalf of the Monster Energy Company 401(k) Plan,<br><br>          *Plaintiffs*,<br><br>     v.<br><br>MONSTER BEVERAGE CORPORATION; ADMINISTRATIVE COMMITTEE OF MONSTER ENERGY COMPANY 401(K) PLAN; and DOES 1-50 as Board Members of Monster Beverage Corporation and/or as members of the Administrative Committee,<br><br>          *Defendants*. | Case No. 8:24-cv-01467-JWH-DFM<br><br>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** |

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

## I.  INTRODUCTION

1.    Plaintiffs, Richard Hollien, Josh McCormick, Charles Whittelsey, individually and as representatives of a Putative Class of Participants and Beneficiaries of and on behalf of the Monster Energy Company 401k Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 *et seq*., against the Plan sponsor and administrator of the Plan, Defendant Monster Beverage Corporation ("Monster" or the "Company"), the Administrative Committee of the Plan ("Committee"), and DOES 1-50 as Board Members of Monster Beverage Corporation and/or as members of the Administrative Committee (collectively, "Defendants").

2.    Federal law affords employers the privilege of enticing and retaining employees by setting up retirement through defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plan"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq*. ("ERISA").

3.    At all relevant times, Defendants were fiduciaries to the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

4.    ERISA and the common law of trusts impose strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries.

5.    29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

6.    29 U.S.C. §1104(a)(1)(B) and common law require a plan fiduciary to discharge her obligations "with the care, skill, prudence, and diligence under the

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

7.    A 401(k) defined contribution plan has become the dominant source of retirement savings for most Americans.

8.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. *See* 29 U.S.C. §1002(34).

9.    Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor. Because retirement savings in defined contribution plans grow and compound over the course of the participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participants are ready to retire. Over time, even slight differences in fees and performance compound, and can result in vast differences in the amount of savings available at retirement.

10.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

11.    Wasting the Plan's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of the Plan's assets, the fiduciaries are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

12.    As set forth below, throughout the Class Period, the Defendants have

-2-

wholly failed to comply with their obligations under ERISA. Defendants imprudently selected and maintained higher cost, lower performing share classes of funds for the Plan which purportedly was for the Defendants' self-serving purpose of obtaining revenue-sharing, but which harmed the Plan and the participants. Defendants further harmed the Plan and the participants by paying unreasonable and unnecessary recordkeeping and administration expenses (collectively, "recordkeeping"), and taking money generated by the excessive fees being charged to the participants to create and maintain an unreasonably large ERISA Benefit Account ("EBA") which, upon information and belief, Defendants have treated like a slush fund; and contrary to Plan documents, Defendants failed to return the remaining annual balances in the EBA to participants in a timely manner. Defendants further have imprudently allowed third parties to take "float income" derived from the Plan's assets instead of returning that money to the Plan.

13. As set forth below, the Defendants have wasted millions of dollars of the Plan participants' money and must be held accountable for the substantial losses resulting from their failure to comply with their obligations under ERISA.

## II. JURISDICTION AND VENUE

11. Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

13. This Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2) because Monster transacts business in this district, resides in this district and/or has

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

significant contacts with this district as do one or more Plaintiffs and Plan participants, and because ERISA provides for nationwide service of process.

## III. THE PARTIES

### A. PLAINTIFFS

14. Plaintiff Richard Hollien resides in the State of California within this Court's jurisdiction, and at relevant times has been an employee of Monster and a participant in the Plan under 29 U.S.C. § 1002(7).

15. Plaintiff Josh McCormick resides in the State of California, and at relevant times has been an employee of Monster and a participant in the Plan under 29 U.S.C. § 1002(7). McCormick remains a participant in the Plan.

16. Plaintiff Charles Whittelsey resides in the State of California within this Court's jurisdiction, and at relevant times has been an employee of Monster and a participant in the Plan under 29 U.S.C. § 1002(7).

17. During the Relevant Time Period, Plaintiffs (and all participants) suffered damages by Plan-wide misconduct of the fiduciaries in the selection, monitoring, and retention of Plan service providers and the investment options in the Plan; and their actions in managing and overseeing the assets, management and operation of the Plan. Plaintiffs' and other participants' account balances are significantly lower than had the fiduciaries acted prudently in compliance with ERISA.

18. As a direct and proximate result of the breaches of fiduciary duties described herein, the Plan, the Participants, including Plaintiffs, and members of the putative class suffered substantial losses and damages in the form of higher fees and lower returns on their investments; being forced to pay for unreasonable and unnecessary expenses; and otherwise having assets wasted, thereby suffering lost opportunity costs due to Defendants' failure to comply with their obligations under ERISA.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

**B.    DEFENDANTS**

19.    Defendant Monster is the current sponsor and administrator of the Plan and maintains its principal place of business at 1 Monster Way, Corona, CA. This entity is registered with the State of California, and conducts business in this district and throughout the State of California.

20.    Defendant Monster, acting through its Board of Directors, directly controlled and managed the operation and administration of the Plan and/or appointed the Committee to control and manage the operation and the administration of the Plan. Monster and the Committee had a concomitant fiduciary duty to prudently select, monitor and supervise any fiduciary appointees/delegates.

21.    Defendant "Does" are the individuals on the Board of Directors and Committee during the Relevant Time Period. The identities of the "Does" are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

22.    The Company, its Board of Directors, and members of the Committee, are all fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or freeze or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the disposition of Plan assets, the selection and compensation of the providers of administrative services to the Plan, and the selection, monitoring, and removal of the investment options made available to participants for the investment of their salary savings and provision of their retirement income.

## IV. STANDING

23.    ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S.

Ct. 3085, 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. *See LaRue v. DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

24.     Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail within this complaint, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remains exposed to harm and continued future losses.

25.     At all relevant times, Plaintiffs are and were participants in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Therefore, Plaintiffs have statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3).

26.     Plaintiffs also have constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because Plaintiffs personally suffered concrete and particularized injuries in many ways, including but not limited to, the following:

>  a. The Plaintiffs and all Plan participants suffered financial harm as a result of the imprudent funds selected and/or maintained by Defendants in the Plan, which caused Plaintiffs and the Plan to pay excessive fees, and deprived them of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT            Case No.

obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b. The Plaintiffs and all participants in the Plan were financially harmed by the Plan-wide flawed processes and unreasonable and imprudent decision-making by the Defendants, and by Defendants' failure to comply with all Plan documents and their obligations under ERISA, which caused Plaintiffs and the Plan to pay for recordkeeping and other costs that were not reasonable and necessary, and to otherwise suffer financial losses.

27. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

## V. TIMELINESS

28. Under ERISA § 413, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." Named Plaintiffs each participated in the Plan within the statutory period and have suffered damages.

## VI. RELEVANT DEFINITIONS AND ERISA PROVISIONS

29. ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A). The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan; an employer or employee organization any of whose employees or members are covered by the

-7-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT    Case No.

plan; a corporation or other entity that is owned by such a person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person. 29 U.S.C. 1002(14). Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

30.     An ERISA fiduciary also has a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id*. § 1104(a)(1)(B).

31.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), also imposes a prudent person standard by which to measure fiduciaries' investment decisions and disposition of assets. The prudent person standard in ERISA requires a continuing duty to monitor Plan investments and Plan service providers and remove imprudent ones. Such duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments and service providers.

32.     These fiduciary duties are the highest known to the law.

33.     The legal construction of an ERISA fiduciary's duties is derived from the common law of trusts. Therefore, in determining the contours of an ERISA fiduciary's duty, courts look to the law of trusts.

34.     ERISA recognizes co-fiduciaries and related liability. ERISA § 405(a), 29 U.S.C. § 1105(a), titled "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with

-8-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

35.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant on behalf of the Plan for relief under ERISA § 409, 29 U.S.C. § 1109, which, in turn, provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

36.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

37.   Monster was the Trust Settlor and the Plan Sponsor of the Plan. Monster

-9-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

is a named fiduciary of the Plan under ERISA § 402(a)(2), the Plan administrator under ERISA § 3(16), and a party in interest under ERISA § 3(14)(A) as well as a Plan fiduciary under ERISA § 3(21)(A) to the extent that it appointed investment managers for the Plan, selected and monitored investment funds in the Plan, and otherwise exercised discretion or control over the administration and management of the Plan and Plan assets.

## VII.   THE PLAN

38.   The Plan is a defined contribution plan covering all eligible employees who are employed by Monster Beverage Corporation and American Fruits and Flavors, LLC (collectively the "Company").

39.   Full-time employees are eligible to enter the Plan beginning the first of the month following the completion of 30 days of employment, and part-time and temporary employees are eligible to enter the Plan beginning the first of the month following the completion of 1,000 hours in one year of service.

40.   Effective February 17, 2022, the Company acquired CANarchy Craft Brewery Collective, LLC, and the CANarchy Craft Brewery Collective, LLC 401(k) Plan ("CCBC Plan") was merged into the Plan and assets of $14,711,607 were transferred into the Plan in July 2022.

41.   As of January 1, 2023, the Plan had 3,542 active participants with account balances. As of December 31, 2023, the Plan had 4,131 active participants with account balances and $213,164,496 in assets.

42.   At all times relevant, Transamerica Retirement Solutions Corporation ("TRSC") has been the Plan recordkeeper.

43.   The Defendants operate under an Investment Policy Statement ("IPS") that purports to guide their investment decisions and management of the Plan.

-10-
PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

# VIII. FACTUAL ALLEGATIONS
## A. DEFENDANTS PAID UNREASONABLE AND UNNECESSARY RECORDKEEPING AND ADMINISTRATIVE FEES.

47.    Effective December 1, 2014, Defendants entered into a "Basic" recordkeeping and Plan administrative services agreement (hereinafter "RKA" services) with TRSC. There is nothing unique or special about the services offered and provided by TRSC under the agreement. As part of the agreement, and in subsequent years, TRSC has charged and received annual "Required Revenue" which is paid from monies taken from the Plan and participants' accounts.

48.    The Required Revenue paid to TRSC is "asset-based", which means it is calculated based on the dollar size of participants' accounts, rather than on a per capita basis. Under this model, the more dollars invested in the Plan, the more fees that are paid for recordkeeping, even though the services remain the same. This means, as participants' accounts grew over time, more compensation was given to TRSC, yet no additional work was performed to justify the increased fees.

49.    At all times relevant, the Required Revenue authorized and allowed by Defendants to be paid to TRSC and other third parties was unreasonable and excessive. The annual Required Revenue has been as high as .48% of all the Plan assets.

50.    On a per-participant basis, the charge to participants in the Plan for recordkeeping during the putative class period has averaged over $100 a year. This is approximately *three* times greater than what was reasonable based on what other comparable plans paid during the Relevant Time Period.   In addition to this already excessive and unreasonable compensation, Defendants have allowed TRSC to take "float income" generated by Plan assets as additional compensation, which further increases the compensation received by TRSC, and which the Defendants should have accounted for had they properly monitored the compensation being paid to TRSC.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

51. At all times relevant, Defendants have wasted Plan assets and imprudently paid excessive and unreasonable compensation to TRSC and other third parties in the form of both direct and indirect compensation.

52. Additionally, in conjunction with the imprudent agreements between Defendants and TRSC, Defendants have authorized and taken excessive "Plan Service Fees" from participants' accounts in order to fund an ERISA Benefit Account ("EBA"), which Defendants apparently use for the benefit of Monster rather than the Plan and the participants.

53. The Plan's investments included (1) share classes that consistently had lower monthly returns from lesser yields, along with (2) wasteful management fees, and (3) more expensive classes of those same funds that were loaded with revenue-sharing costs that unreasonably depleted participants' accounts and reduced their investment returns.

54. Using the Plan's Form 5500 data and the data provided by the US Department of Labor, the Plan's average recordkeeping costs paid from Plan assets totaled $104.52 per year per participant from 2018 through 2022.[1] This cost to participants greatly exceeds comparable size plans with similar number of participants providing the same or similar service, as demonstrated using data below.

55. In addition to the excessive cost per participant, Defendants breached their fiduciary duty of prudence by selecting and retaining TRSC and paying excessive RKA costs year after year, demonstrating a flawed process in their

---

[1] This figure was calculated using the direct compensation paid to the Plan's recordkeeper (as identified in Schedule C (2) of the Plan's Form 5500) as the denominator, and the total number of participants with account balances as of the end of the year (from Line 6(g) of the 5500s) as the numerator. For example, in Plan Year 2018, direct compensation paid to TRSC totaled $185,849 and 1,636 participants had account balances at year end, for a total recordkeeping cost of $113.59 per participant. The same formula was used to calculate the recordkeeping cost for Plan Years 2019, 2020, 2021, and 2022, and for the comparator plans identified in ¶¶67-68 *infra*.

-12-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

selection and monitoring of service providers.  Using the same data, the range of recordkeeping costs on a per participant basis was 2018: $113.59, 2019: $86.61, 2020: $69.23, 2021: $174.25, and 2022: $78.94. The costs increased in 2023 above what was paid in 2022.

56.    Given the great disparity between what the Plan has paid for recordkeeping during the putative class period and what comparable plans have paid, the reasonable inference can be drawn that Defendants had a flawed process or no process at all for selecting, monitoring and retaining a recordkeeper, and failed to properly benchmark costs and/or issue requests for proposals.

57.    Defendants have a duty to prudently select and monitor covered service providers ("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation.

58.    Every defined contribution plan must pay for recordkeeping services, which tend to be a largely automated service that can easily be provided at a relatively low fixed cost per participant in a qualified retirement plan. Which is to say, the cost of recordkeeping for an individual plan participant is, and should be, a relatively flat cost that is unrelated to the value of an individual plan participant's assets in the plan.

59.    The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

60.    Recordkeepers    for    defined    contribution    plans    are    sometimes compensated through direct payments from the plan (participants) or employer, or

-13-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

alternatively, or in conjunction therewith, through indirect payments via a practice known as revenue sharing.

61.    When fiduciaries choose to use revenue sharing arrangements to pay recordkeepers on an asset-based basis, the fiduciaries must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary either refuses to engage in revenue sharing, or at a minimum, ensures that the fees are capped and that the recordkeeper promptly rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.

62.    Among the public information available to the Defendants, the Defendants should have been aware that based on the number of Plan participants, the assets in the Plan, and the basic and generic services provided by Transamerica to the Plan, the Plan certainly could have obtained the same recordkeeping services for no more than $43 per participant, if not less, and/or for less than .10% of Plan assets on an annual basis. *See*, *e.g.*, 15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey. https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf. (reflecting the recordkeeping fees identified in the NEPC's 2020 Defined Contribution Plan & Fee Survey which included 142 defined contribution and deferred compensation plans. Fees were gathered from participating plans' service providers and recast in a uniform format.)

63.    There are numerous recordkeepers in the marketplace (including, but not limited to, Fidelity, Vanguard, Voya and Great-West) who are capable of providing a high level of service to the Plan, and who will readily respond to a formal "request for proposal" ("RFP"). These recordkeepers primarily differentiate

-14-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

64.    The package of recordkeeping services the Plan received included standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

65.    The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

66.    The market for defined contribution recordkeeping services is highly competitive.

67.    Each year, Defendants reported, via Form 5500 reports for the Plan, the total cost of its recordkeeping fees. The Plan's total recordkeeping costs, and cost per plan participant are summarized in the chart below.

| Year | Number of Participants[2] | Recordkeeping Fees (from Form 5500)[3] | Recordkeeping Fee per Plan Participant[4] |
|---|---|---|---|
| **2018** | 1,636 | $185,849 | $113.59 |
| **2019** | 1,835 | $158,934 | $86.61 |
| **2020** | 2,052 | $142,068 | $69.23 |
| **2021** | 2,322 | $404,609 | $174.25 |
| **2022** | 3,556 | $280,726 | $78.94 |

[2] This figure reflects the total number of participants with account balances at year end as reflected on Line 6(g) on Defendants' Form 5500s.

[3] This figure reflects the direct compensation paid to TRSC from Schedule C (2) on Defendants' Form 5500s.

[4] *See supra,* n. 1 (identifying the numerator and denominator respectively) for calculating the recordkeeping fee per participant.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

68.     Based on Form 5500 filings, the chart below compares the average recordkeeping costs paid by the Plan during the Class Period to comparable plans with a similar number of participants to those in the Plan, and/or similar amounts of plan assets, receiving substantially similar services as those of the Plan.  As shown above, the Plan paid an average of $104.52 per participant, as compared to similar plans that ranged from $11 - $44 per participant, over the identical time periods.

| 2018 Through 2022 Plan Averages | | | | | |
|---|---|---|---|---|---|
| Plan Name | Total Participants with Account Balances at Year End[5] | Direct Compensation Paid to the Recordkeeper[6] | Recordkeeping Fees Per Participant[7] | Total Plan Assets | Recordkeeper |
| DropBox 401(k) Plan | 3,730 | $141,224 | $37.77 | $238,678,357 | Vanguard |
| Pinterest 401(k) Plan | 2,940 | $64,342 | $21.97 | $179,794,602 | Vanguard |
| Granite Retirement Savings Plan | 2,547 | $87,106 | $32.97 | $152,207,830 | Vanguard |
| Verint Systems, Inc. 401(K) Savings Plan | 2,300 | $30,587 | $13.36 | $305,260,557 | Fidelity |
| Destination XL Group, Inc. 401(K) Savings Plan | 2,311 | $96,177 | $44.97 | $81,292,696 | Fidelity |
| AWG, Inc. Restated 401(K) Plan | 2,855 | $108,313 | $37.99 | $248,580,400 | Wells Fargo / Merrill Lynch |
| MII Associates' Retirement Savings 401(K) Plan | 2,913 | $34,386 | $11.71 | $283,672,138 | Wells Fargo / Principal |
| **Monster Energy Company 401(k) Plan** | **2,280** | **$234,437** | **$104.52** | **$119,645,794** | **Transamerica Retirement Solutions** |

69.     As demonstrated above, the Plan's fiduciaries imprudently permitted the Plan to pay recordkeeping costs that were multiples of the amount charged to similarly situated plans, on a per-participant basis. The data indicates a flawed

[5] This figure reflects the average total number of participants with account balances at year end as reflected on Line 6(g) on Defendants' Form 5500s from Plan Year 2018, 2019, 2020, 2021 and 2022.

[6] This figure reflects the average total direct compensation paid to TRSC from Schedule C (2) on Defendants' Form 5500s from Plan Year 2018, 2019, 2020, 2021 and 2022.

[7] This number represents the average recordkeeping fees per participant across Plan Year 2018, 2019, 2020, 2021 and 2022.

-16-

process in monitoring the recordkeeper to ensure excessive fees were not paid by participants, including Plaintiffs.

70.     Upon information and belief, the Defendants failed to continually benchmark their RKA fees and failed to timely issue formal Requests for Proposals ("RFPs") to solicit lower price bids for the Plan's recordkeeping and administrative services. It is well recognized that RFPs result in lower costs being incurred for recordkeeping and administrative services and should be conducted every 3-5 years and/or when there are substantial changes to the Plan, including the size of the Plan and the number of participants.

71.     As a result of Defendant's imprudent manner of obtaining the necessary recordkeeping services for the Plan, the Plan participants, including Plaintiffs, were harmed by the loss of significant savings.

72.     Defendants may argue that the imprudent selection of the funds discussed below is defensible because a revenue-sharing arrangement for those investments was used to offset the Plan's recordkeeping costs.  However, that argument fails because the Plan's recordkeeping costs, paid through its revenue-sharing agreements, vastly exceeded reasonable costs that should have been paid, and the participants, including Plaintiffs, were harmed by the overpriced and underperforming funds being included in the Plan's investment lineup.

## B.     DEFENDANTS FAILED TO PRUDENTLY SELECT AND MONITOR FUNDS, FUND MANAGERS, AND COVERED SERVICE PROVIDERS.

73.     Defendants violated their fiduciary obligations by selecting and retaining overly expensive, underperforming investment options and by paying third parties, such as its recordkeeper, more than reasonable compensation for RKA, thus wasting Plan assets.

74.     As discussed below, in most years, many of the funds included in the Plan had less expensive share classes available.

75.     The SEC's Office of Investor Education and Advocacy, which is the

-17-

governing body overseeing mutual funds, advises:

> Many mutual funds offer different types of shares, known as "classes."  Each class of shares of the mutual fund invests in the same "pool" (or investment portfolio) of securities, but each class may have different fees and expenses. *This means that owning a different class of the same fund will result in different investment returns. The effect of different fees on different mutual fund share classes is compounded over time.*
>
> *            *            *
>
> The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time.

https://www.investor.gov/introduction-investing/general-resources/news alerts/alerts-bulletins/investor-bulletins-61 (emphasis in original), last visited May 28, 2024.

76.    "Revenue sharing" does not justify Defendant's actions. Defendant's use of higher cost share classes to pay RKA expenses by way of "revenue sharing" is the most inequitable, inefficient, and expensive method available for paying RKA.

77.    Revenue-sharing results from a *daily* deduction taken directly from a fund's gross asset value (GAV), which immediately reduces participants' account balances, and reduces future compounding of the assets and returns of that mutual fund class.

78.    Defendants' revenue sharing model hides from participants the amount actually being paid for such services as compared to a quarterly fee amount that has a related transaction description that participants can see on their Plan's website and each quarterly statement.

79.    The asset-based method of paying for RKA charges provides for pro rata fees that are "in proportion" to assets held by the participants. Thus, payment for

-18-

RKA increases in proportion to employees' (1) wages saved, and (2) market and investment growth.

80.    Revenue sharing reduces investment returns and makes recordkeeping and other administrative costs interdependent with plan participant returns. Increased compensation is given to service providers (from participants), despite no additional work being performed by the service providers, like TRSC.

81.    As explained in more detail below, Defendants violated their fiduciary obligations by permitting the Plan to retain higher cost, lower yielding, share classes, when cheaper, better performing, yet otherwise *identical* investments were readily available in the form of less expensive share classes.

82.    The availability of "identical" investments in the mutual funds means they had the same RIC (registered investment company), the same manager, and precisely the same fund holdings. The only difference lies with the funds' expense ratios, with Defendants choosing and allowing the more expensive share classes to remain in the Plan.

83.    The lower cost share classes were readily available. Any minimum purchase amounts for "qualified retirement plans" (QRP) and "omnibus trusts," could be waived and thus, there was no proper reason to not select the less expensive share classes for the Plan.

84.    Defendants' violations resulted from their failure to adopt, utilize and/or follow prudent processes in managing the Plan. In analyzing the conduct of fiduciaries, courts "focus not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Tibble v. Edison Int'l (Tibble III)*, 843 F.3d 1187 (9th Cir. 2016) (*en banc*) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

85.    A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (internal quotations omitted).

-19-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

86.    Restatement 3d of Trusts, § 90 (2012) directs when devising and implementing strategies for the investment and management of trust assets, responsible Defendants had and have a duty to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."

87.    The Defendants repeatedly failed to act solely and exclusively for the benefit of participants by selecting and retaining investments in the Plan not because the subject funds merited inclusion, but because the funds would charge Participants unreasonable fees that Defendants could then use to pay for overpriced RKA and/or create and fund an "ERISA Benefit Account" that Defendants treated as a "slush fund" to draw upon to pay expenses that should have and/or otherwise would have been born by Monster.

88.    Defendants had the tremendous bargaining power to demand low-cost recordkeeping services and well-performing, low-cost investments.  All the disputed funds' SEC-prospectuses waived "initial purchase minimums for omnibus trusts/QRPs."

89.    Defendants had a deficient process for selecting, evaluating and monitoring funds as shown by the fact that funds with unreasonably high expenses remained in the Plan during the Class Period, rather than the lower cost, but otherwise identical alternative share classes of the funds that also offered higher returns.

90.    The mutual funds' excessive fees significantly reduce fund net asset values (NAVs) or prices each day and these costs affect all future returns to the trust investment (from reduced recurring dividends/interest).

91.    From the www.SEC.gov site: "Management fees are fees that are paid out of fund assets to the fund's investment adviser (or its affiliates) for managing the fund's investment portfolio."

92.    Fund managers are paid to manage mutual funds (and all their

-20-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

underlying share classes) for a percentage fee based on assets and a fee is taken daily from the fund.

93. Such actively managed funds do not, in and of themselves, constitute a poor investment. However, a prudent fiduciary must consider the impact of an active funds' fees on its overall performance.

94. Section 227 of the Restatement 3rd of Trusts (Prudent Investor Rule), comment h, page 30 (emphasis added), provides:

> Active strategies…entail investigation and analysis expenses and tend to increase general transaction costs, including capital gains taxation. Additional risks also may result from the difficult judgments that may be involved and from the possible acceptance of a relatively high degree of diversifiable risk. These considerations are relevant to the trustee initially in deciding whether, to what extent, and in what manner to undertake an active investment strategy and then in the process of implementing any such decisions. If the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations.

95. Defendants cannot justify the unnecessary and unreasonable fees charged by the investment options in the Fund during the Class Period.

**1. Defendants Filled the Plan with Higher Cost, Lower Performing Share Classes of Funds Despite Lower Cost, Higher Performing Share Classes Being Readily Available.**

96. Defendants violated their duty of prudence in selecting and retaining the funds in higher cost, lower performing share classes despite share classes with identical investments but lower expenses and higher returns being available.

97. When engaging TRSC as the recordkeeper, the Defendants agreed to offer TRSC's automated asset-allocation platform, PortfolioXpress®, to Plan participants to mix the investments in their accounts. In fact, this was the default option for investments not otherwise allocated. However, the funds used in the mix were limited to those in the Plan and were unreasonably expensive.

-21-

98. Further, Plan participants, such as Plaintiff McCormick, are charged a fee for the use of PortfolioXpress® which is unnecessary and unreasonable for an automated service, and is especially egregious in light of the additional unreasonable fees the participants are being charged by the funds in the Plan.

99. Plaintiff McCormick has invested in numerous funds in the Plan during the Class Period, specifically including: Dodge & Cox Income I; Eaton Vance High Income Opportunities A; PIMCO Real return A; Goldman Sachs Stable Value Prem Series; Hartford World Bond R6; PIMCO Real Return A; Victory Incore Fund for Income A; American Funds EuroPacific Gr R6; Calvert Equity A; ClearBridge Small Cap Growth IS; Columbia Disciplined Growth Instl3; Fidelity 500 Index; Hartford Schroders US S/M-Cap Opps SDR; JPMorgan Emerging Markets Equity R6; JPMorgan Mid Cap Growth R6; MFS International Intrinsic Value R3; MFS Value R3; Principal Real Estate Securities R6; and Victory Sycamore Small Company Opportunity.

100. Plaintiff Whittelsey has invested in numerous funds in the Plan during the Class Period, specifically including: Calvert Equity A, Victory INCORE Fund for Income A, MFS Value R3, JP Morgan MidCap Growth A, MFS International Intrinsic Value R3, and American Funds Balanced R4, and paid unreasonable fees in connection with those investments.

101. Plaintiff Hollien has invested in numerous funds in the Plan during the Class Period, specifically including: Victory INCORE Fund for Income A, Calvert Equity A, JPMorgan Mid Cap Growth A, and MFS International Intrinsic Value R3.

102. Plaintiffs and all Participants were harmed by the Plan not offering and selecting the lower cost share classes (as described in more detail below) which shows a flawed process by Defendants in the selection, retention and monitoring of the Plan funds.

103. As required by the SEC, all mutual funds must file and maintain a fund prospectus. The prospectus describes the mutual fund to prospective investors. The

-22-

prospectus contains information about the mutual fund's costs, investment objectives, risks, and performance. These are readily available on a government website located at https://www.sec.gov/edgar/searchedgar/prospectus.

104. A prospectus contains important information about a fund's fees and expenses, investment objectives, investment strategies, risks, performance, pricing, and more.

105. A prospectus also identifies the portfolio managers' choice of indexed benchmark or an impartial and "appropriate broad-based securities market index." Investment performance is always measured against a market index.

106. In addition to the SEC-prospectus (www.sec.gov/edgar) *selected by the fund managers*, third parties may provide comparators for each fund.

107. Morningstar, Inc. ("Morningstar") is one such third party that provides research and analytics that are used throughout the asset management industry.

108. The Funds in the Plan were imprudent at all times during the Class Period. By way of example, using prospectus data available to Defendants as of December 31, 2020, the table below demonstrates Defendants' imprudent behavior in selecting and maintaining the more expensive share classes of the identified funds (this is by way of example only, and Plaintiffs challenge many other funds in the Plan during the Class Period). Defendants' actions caused the Plan to offer higher cost and lower performing share classes.

109. By way of example, based on publicly available information, as of December 31, 2020, had the Defendants looked back over the past five years of returns, they would have seen that the "**American Funds Balanced R4**" fund in the Plan lagged fifty-seven basis points (0.57%) per year behind the cheaper class R6 class. The 0.57% was much greater than the expense ratio difference of thirty-five basis points (.61% - .26%=.35%).  Therefore, even if every penny difference in the expenses between the share classes went to revenue share and was used to benefit the Plan and participants (which it was not), the Plan and participants still were worse

-23-

off by the selection of the R4 share class by the Defendants.

110. The Committee's imprudence eroded the financial growth potential for the assets in the fund and deprived participants of the additional earnings they would have received with the R6 class.

111. Further compounding the Defendants' imprudence and harm to the Plan and participants, Defendants wasted revenue-sharing credits by using the revenue share generated by the fund fees to pay for unreasonable and unnecessary expenses, and also unreasonably funded the EBA through revenue-sharing and then failed to comply with the Plan documents and timely return the balance of the EBA to participants annually.

112. Regarding the **Calvert Equity A** share class, the Defendants had multiple failures over the years. They added the Calvert Equity A class fund in 2016. At that time, the cheaper institutional ("I") class of the same Calvert Equity fund was available for 25 basis points less. Then, effective October 3, 2017, an even cheaper R6 class was available at 7 basis points less than the institutional class and a full 32 basis points cheaper than the A class, which Defendants allowed to remain in the Plan.

113. The table below shows the difference in the share classes available over the past 6 years. For each fund, Defendants selected the higher expense ratio share class of what is otherwise the identical investment, to the detriment of participants, resulting in substantial monetary losses:

| Fund/ Share Class in Plan | Expense Ratio | Fund/Share Class Available | Expense Ratio | % Higher Fee |
|---|---|---|---|---|
| American Funds Balanced R4 | 0.61 | American Funds Balanced R6 | 0.26 | 134% |
| Calvert Equity A | 0.99 | Calvert Equity I | 0.74 | 33.78% |
| Calvert Equity A | 0.99 | Calvert Equity R6 | 0.67 | 47.76% |
| JPMorgan Mid Cap Growth A | 1.24 | JPMorgan Mid Cap Growth R6 | 0.74 | 67.56% |
| Victory Established Value A | 0.92 | Victory Established Value R6 | 0.58 | 58.62% |

-24-

114.  The same holds true for the other funds in the Plan.  As shown in the table above, Defendants kept the **JPMorgan MidCap Growth A** class in the Plan even though it was 50 basis points more expensive than the identical R6 class. This caused participants to pay almost 68% more in fees each year they were invested in the fund.

115.  Similarly, the **Victory Established A** shares in the Plan were 34 basis points more expensive than the identical R6 shares. This caused participants to pay almost 59% more in fees each year they were invested in the fund.

116.  The table above is a basic example of the facts present and available to Defendants from each fund's prospectus when reviewing investment options back in 2018. The Defendants could and should have recognized the potential harm caused by selecting the more expensive share classes regardless of any revenue-sharing.

117.  The table below shows the annual returns for the two share classes of the **Victory INCORE Fund for Income** for the five year period looking back from 2018. The investments in each share class are identical, but by choosing share class A, the Defendants chose the option with the lower annual returns each year over the previous five years, and given the higher expenses charged for that share class, made it a certainty that the returns going forward would likewise be worse for the A share class.

|  | **Annual Yield %** | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Class A in Fund vs I/R6 (R6 inception 03/04/2015)** | **2017** | **2016** | **2015** | **2014** | **2013** | **No Load** |
| Victory INCORE Fund for Income Class A | *5.39* | *5.23* | *4.95* | *5.02* | *5.07* | *No* |
| Victory INCORE Fund for Income Class I/R6 | 5.67 | 5.51 | 5.25 | 5.37 | 6.12 | Yes |

118.  By selecting and maintaining the Victory INCORE Class A shares in the Plan, Defendants selected an option that they knew at the time would be expected to cause participants to lose about 5% or more each year that they otherwise could have and should have realized.

119.  Furthermore, in selecting and maintaining the Victory INCORE Class A for the Plan, the Defendants ignored the relevant factors in the Investment Policy

-25-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

Statement ("IPS") relating to costs and expenses when operating the Plan in 2018 and later.

120. Defendants' course of common conduct shows that they ignored the IPS and acted imprudently in regard to most of the funds in the Plan over the Class Period by selecting higher cost and worse performing share classes over the prudent alternatives.

121. The Defendants held imprudent funds in the Plan every year, and their monitoring failures occurred continually throughout the Class Period.

122. The table below shows the more recent performance of the Victory INCORE Fund for Income, as well as two other funds in the Plan. For each fund, the Defendants selected and maintained the more expensive, worse performing "A" class, or "R3" class in the case of the MFS fund, instead of the cheaper and better performing R6 or I class shares.

| Share Class in Plan (A, R3) vs. Alternative (R6, I) | Annual Yield % | | | | | |
|---|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
| Victory INCORE Fund for Income Class A | 5.39 | 5.41 | 4.98 | 4.62 | 5.42 | 5.60 |
| Victory INCORE Fund for Income Class R6 | 5.68 | 5.70 | 5.25 | 4.94 | 5.71 | 5.89 |
| PIMCO Real Return Fund Class A | 2.85 | 8.27 | 4.72 | 2.21 | 1.69 | 2.29 |
| PIMCO Real Return Fund Institutional Class | 3.25 | 8.71 | 5.11 | 2.60 | 2.08 | 2.70 |
| MFS International Intrinsic Value Fund Class R3 | 1.61 | 0.77 | 0.71 | 0.40 | 1.16 | 1.35 |
| MFS International Intrinsic Value Fund Class I | 1.79 | 0.94 | 0.75 | 0.59 | 1.33 | 1.55 |

123. This is direct evidence of impudent conduct because it was not in the participants' best interests to have the more expensive, worse performing, share classes in the Plan. **A reasonable and prudent fiduciary would not have selected or maintained the higher cost share class when a cheaper, identical version was available at the time of the conduct**. As with all of the funds, the precise damages figure will be calculated when specific Plan data is received during discovery.

124. The Defendants did not need to scour the universe to identify the cheaper share classes for the funds in the Plan or to learn the financial impact their decisions would have on the Plan participants because this information is readily

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

available through, by example, FINRA's free, online FundAnalyzer. *See* tools.finra.org/fund analyzer.

125.   To use the online tool, Defendants needed only to type part of a fund's name, and then all share classes would show.  This means users do not need to know the fund's ticker symbol. The FundAnalyzer's default settings are (1) $10k balance earning a (2) 5% growth rate (mutual funds' average growth rate per year since 1900s). In seconds, FINRA's results display.

126.   By way of example, using the Victory INCORE Fund for Income, as shown in the screenshot below (A class versus the R6 class)—the "Future Value" of the A class investment is $12,688.92 after six years versus $12,903.88 for the R6. This translates to lost earnings for the participant of $214.96.

127.   The "Total Cost" for the participant with the A class in this scenario would be $616.50 versus $430.56 for the cheaper R6 class. The growth difference in the earnings ($214.96) exceeds the difference in the cost ($185.94) due to the extra compounding for higher returns realized by participants who were in the R6 class.

-27-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

128.   The Department of Labor has stated that when assembling, choosing, or modifying an investment menu for participants' investment choices, a fiduciary must evaluate the investment alternatives on the menu *based solely on pecuniary factors*, not subordinate the interests of participants to unrelated objectives, and not sacrifice investment return or take on additional investment risk to promote non-pecuniary objectives or goals. This is exactly what the Defendants in this case did—they repeatedly sought more expensive investment options when higher yielding, less costly identical share classes were available at the time of their conduct.

129.   By way of further example, the table below shows, in percentages, how much more expensive the identified funds in the Plan were for each year as compared to the cheaper share classes that were available. Defendants knowingly committed Participants to paying these higher costs each year, resulting in tremendous financial harm.

-28-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

**Percentage More Expensive than Cheaper Share Class Available**

| Fund in Plan | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Calvert Equity Fund A | 54% | 52% | 49% | 48% | 48% | 52% | 51% | 62% | 77% | 81% |
| Victory Fund for Income A | 44% | 44% | 44% | 44% | 44% | 40% | 44% | 49% | 52% | 43% |
| MFS Value R3 | 80% | 86% | 78% | 77% | 73% | 73% | 69% | 69% | 66% | 64% |
| PIMCO Real Return A | 60% | 85% | 85% | 75% | 45% | 45% | 89% | 89% | 89% | 89% |
| MFS Intl Intrinsic Value R3 | 32% | 35% | 35% | 34% | 34% | 34% | 33% | 33% | 30% | 28% |

130. If a fiduciary makes an investment decision based on non-pecuniary factors, the fiduciary always remains subject to ERISA's general loyalty obligation and must act in a manner that is consistent with the interests of participants and beneficiaries in their retirement income or financial benefit**s.**

**2.     Revenue-Sharing Does not Justify the Added Expenses**

131. Revenue sharing does not justify Defendant's actions. The challenged funds' total return and yields were depleted by *more than the purported revenue sharing credits*. That is, the lost opportunity costs were much greater than the short-term revenue-sharing credits.

132. A 2011 study on 401(k) plans by the Government Accountability Office (GAO) suggests that due to plan sponsors' and participants' lack of understanding of indirect fees, recordkeepers may not reduce direct fees sufficiently. If direct and indirect payments do not offset each other, recordkeepers may collect more revenue in the presence of indirect compensation and participants may pay higher fees in these plans. Additionally, if recordkeepers are better off when they receive compensation indirectly, they may influence 401(k) sponsors to include and subsequently keep funds on the menu that pay a higher rebate, even when these funds are dominated by peer options. Therefore, revenue sharing may also impose costs on participants through its effect on the menu design.

133. Any revenue sharing credit that may eventually make it to the responsible "paying participant" is (1) missing the compounding of earnings and (2)

-29-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

conditioned as to whether the plan's sponsor, Monster, negotiated full revenue sharing collection and eventual credit back to affected participants (which, here, it did not).

134. Defendants' selection of high-priced funds, in conjunction with paying unreasonably high asset-based recordkeeping costs and using revenue-sharing to unreasonably fund the EBA (while not returning the excess to participants to invest as they intended) caused significant monetary harm to the Plan and the participants. The specific damages will be calculated once data is produced in discovery.

### 3. Defendants Failed to Follow the IPS

135. In addition to selections and retentions of investment options based on yields and expense ratios like set forth above, the IPS guiding the Defendants uses Sharpe ratios, standard deviation, alpha, batting average and capture ratio to determine which investments should be selected and retained. Looking specifically at these IPS factors, and using the MFS Value class R3 that the Defendants maintained in the Plan as just one example, it is clear how the Defendants' actions violated the IPS.

136. Prudent application of the IPS to the facts and circumstances of the Plan's largest fund—their MFS Value Fund (class R3)—should have restricted or disallowed the use of the MFS Value fund class R3 fund in 2014 and later.

137. The IPS states on page 4, under "Selection of Investment Alternatives":

> In addition to diversification and risk tolerance considerations, the Committee intends to consider investment expenses in the selection of investment alternatives. It is anticipated the Committee will regularly review all costs associated with the management of the Plan's investment program in accordance with ERISA Section 408(b)(2) regulations. These costs include the following: Expense ratios of each investment alternative …administrative fees, including record keeping fees …etc.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

138.   Based on Monster's Form 5500s, participants' wages invested in the MFS Value fund averaged $11,140,115 dollars from 2018 to 2023. Thus, given the expense ratio of the R3 share class in the Plan, the total expenses for this fund taken from the participants over that period of time equaled **$543,637.61** (for the R3 class) and, in comparison, would have been only **$306,353.16** for the R6 class, which means the Plan and participants suffered hundreds of thousands of dollars in losses from just this one example.

139.   The IPS instructs the Plan fiduciaries to look at the costs of investments. The table below compares the cost (expense ratios) of the R3 share class with the R6 class for the MFS Value fund from the time the R3 class was added to the Plan in 2014 through 2023:

### EXPENSE RATIO

| Fund | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
|------|------|------|------|------|------|------|------|------|------|------|
| MFS Value Fund R3 | 0.79 | 0.80 | 0.80 | 0.83 | 0.83 | 0.83 | 0.86 | 0.86 | 0.88 | 0.92 |
| MFS Value Fund R6 | 0.44 | 0.43 | 0.45 | 0.47 | 0.48 | 0.48 | 0.51 | 0.51 | 0.53 | 0.56 |

140.   The MFS Value Fund R3 class held the same exact 73 stocks, with the same fund managers (Chitkara/Cannan) who started managing all classes of the MFS Value fund on May 31, 2006. Thus, the share classes irrefutably had similar aims, risks, rewards and characteristics. The only difference was the additional 35 basis points in expenses charged year after year for the R3 class. This was a needless expense incurred by the Plan.

141.   The MFS Value fund R3's inception date was April 1, 2005.  The R6 incepted May 1, 2006, and therefore was available throughout the Class Period should the Defendants have selected it.

142.   The IPS metric, "Sharpe ratio" was designed to measure the skill of the MFS Value portfolio manager. Since its inception, the cheaper, identical R6 class

-31-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

used the same manager but had a less harmful Sharpe ratio, consistently beating the R3 class every year.

| Sharpe Adjusted Ratio v. Benchmark[8] (increased negative value is worse) | | | | | | |
|---|---|---|---|---|---|---|
| Fund | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 |
| MFS Value Fund Class R3 (worse) | -0.73 | -0.39 | -1.35 | -1.23 | -0.75 | -0.89 |
| MFS Value Fund Class R6 (better) | -0.67 | -0.32 | -1.27 | -1.14 | -0.63 | -0.78 |

143.   The MFS Value fund R3's extra costs not only (1) reduced participants' investment returns, but they also (2) increased risks (like standard deviation, tracking error, etc.).[9]   Defendants should have used the relative Sharpe ratios as one more reason to replace the R3 share class with the R6.

### C.   DEFENDANTS' ACTIONS EVIDENCE THE LACK OF A PRUDENT  PROCESS.

144.   As demonstrated above, the information necessary for Defendants to make prudent decisions was readily available at all times. The facts are overwhelming that the same higher cost funds selected/retained by the Defendants (1) appear on the same pages of their respective prospectuses at the SEC's website and (2) a cheaper class was always available at the time of the Defendants' conduct. *Kruger, et al. v. Health, Inc.*, 131 F.Supp.3d 470, 476 (M.D.N.C. 2015) ("Plaintiff are not arguing that Defendants had a duty to scour the market to find and offer any

---

[8] Defined as expected active return divided by Tracking Error, where active return is the difference between the return of the security and the return of a selected benchmark index, and Tracking Error is the standard deviation of the active return. This ratio is often used to gauge the skill of managers of mutual funds, hedge funds, etc. It measures the expected active return of the manager's portfolio divided by the amount of risk that the manager takes relative to the benchmark. The higher the information ratio, the higher the active return of the portfolio, given the amount of risk taken, and the better the manager.

[9] The MFS Value fund is an imprudent investment overall. Investors seek a positive 1.00 Sharpe ratio (a 2.00 Sharpe score is very good). This fund should have been replaced with an index mirroring its benchmark (Russell 1000).

-32-

cheaper investment. Instead, Plaintiff allege that 'lower-cost funds with the identical managers, investments styles, and stocks' should have been considered by the Plan.").

145.   In the *Tibble v. Edison Int'l* line of cases, the district court ultimately recognized that the "decision to invest in retail-class shares instead of institutional-class shares of the same fund violated [the] duty of prudence." *Tibble v. Edison Int'l*, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017).

146.   All share classes could have been purchased by the Defendants without meeting any minimum amount of assets.  Defendants' failures caused the Plan and the participants substantial monetary harm. The only reason for Defendants to choose and keep the more expensive share classes year after year was to receive revenue-sharing credits that allowed Defendants to shield from participants the RKA and other payments to third parties while also allowing Defendants to create and fund the EBA which Monster used to benefit itself at the expense of the Plan and the participants.

## IX. CLASS ACTION ALLEGATIONS

147.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons, except Defendants, and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 26, 2018 through the date of judgment (the "Class Period").

148.   The members of the Class are so numerous that joinder of all members is impractical. There are thousands of participants in the Plan.

149.   Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class Members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT      Case No.

Plaintiffs consistent with other Class Members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class Members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

150. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

C. Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

151. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

152. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or

-34-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

impede their ability to protect their interests.

153. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

## VIOLATION OF 29 U.S.C. § 1104(a) and 1105(a)

## (DUTY OF PRUDENCE)

154. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

155. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

156. In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

157. In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523.

158. At all relevant times, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

159. Defendants breached their fiduciary duties in multiple respects. Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping and administrative services and had a flawed process for selecting and

-35-

retaining investments and service providers.

160. Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the unreasonably high cost of the funds in relation to other comparable investments. By doing so, Defendants benefited themselves at the expense of the Plan and the participants and wasted Plan assets.

161. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees by the Plan's service providers; (b) the selection and retention of investment options for the Plan were prudent; (c) that Plan expenses were reasonable and necessary; and (d) the ERISA Benefit Account was prudently funded and managed for the Benefit of the Plan and the participants, used only for necessary and reasonable Plan expenses, and any balance was returned in a timely manner to participants in accordance with the Plan documents.

162. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

163. Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

164. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

165. In addition, Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in the Prayer for Relief.

-36-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.

## SECOND CAUSE OF ACTION

## FAILURE TO MONITOR OTHER FIDUCIARIES

166. Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

167. The Company had the authority to appoint and remove members of the Board of Directors, the Committee and other fiduciaries to the Plan.

168. As the appointing/selecting fiduciaries, Monster had a duty to monitor its appointees and providers it selected to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

169. The Company also had a duty to ensure that its appointees and Plan service providers it selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

170. The Company breached its fiduciary monitoring duties by, among other things:

    a. Failing to monitor and evaluate the performance of its appointees and Plan service providers, or have a system in place for doing so, paying excessive and unreasonable recordkeeping and administrative fees, and standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions and wasting of Plan assets;

    b. Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate and/or utilize lower-cost share classes;

    c. Failing to remove Committee members and service providers who

-37-

were incompetent, who charged excessive or unnecessary fees, and/or whose performance was inadequate; and

d. Taking excessive amounts from the Plan and participants' accounts to fund the ERISA Benefit Account, failing to use the ERISA Benefit Account for the sole benefit of the participants, and failing to allocate the balance in the ERISA Benefit Account to participants in a timely manner in accordance with the Plan documents.

171. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

## PRAYER FOR RELIEF

172. Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

a. Certify the Class, appoint Plaintiffs as class representatives, and appoint undersigned counsel as Class Counsel;

b. Find and declare that Defendants have breached their fiduciary duties as described above;

c. Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from the breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

d. Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

e. Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

f. Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

g. Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited

-38-

transactions, and cause Defendants to disgorge such monies and return them to the Plan;

h. Impose a surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

i. Order actual damages in the monetary amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

j. Order equitable restitution against Defendants;

k. Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

l. Order the payment of interest to the extent it is allowed by law; and

m. Grant other equitable or remedial relief as the Court deems appropriate.

Dated:  November 7, 2024                     **TOWER LEGAL GROUP, P.C.**

By:  _James A Clark_
JAMES A. CLARK
RENEE P. ORTEGA

Peter A. Muhic
(admitted pro hac vice)
**MUHIC LAW LLC**
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
Telephone: (856) 324-8252
Email: peter@muhiclaw.com

Edwin J, Kilpela, Jr.
(admitted pro hac vice)
**WADE KILPELA SLADE LLP**

-39-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT        Case No.

6425 Living Place
Suite 200
Pittsburgh, PA 15206
Telephone: (412) 314-0515
Email: ek@waykayslay.com

*Attorneys for Plaintiffs and the
Proposed Class*

-40-

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT          Case No.